2017 UT App 30

# THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
COOPER JOHN ANTHONY VAN HUIZEN,
Appellant.

Opinion
No. 20140602-CA
Filed February 16, 2017

Second District Court, Ogden Department
The Honorable Ernest W. Jones
No. 131902542

Elizabeth Hunt, Attorney for Appellant

Sean D. Reyes and Christopher D. Ballard, Attorneys
for Appellee

Monica Maio, Attorney for Amicus Curiae Utah
Juvenile Defender Attorneys

JUDGE STEPHEN L. ROTH authored this Opinion, in which JUDGE J.
FREDERIC VOROS JR. and SENIOR JUDGE RUSSELL W. BENCH
concurred.[1]

ROTH, Judge:

¶1     Cooper John Anthony Van Huizen was involved in an aggravated robbery when he was sixteen years old. The State charged him in juvenile court under the Serious Youth Offender Act. After a hearing, the juvenile court bound Van Huizen over to stand trial as an adult in district court as provided by the Act, and he appeals. We vacate and remand for further proceedings.

---

1. Senior Judge Russell W. Bench sat by special assignment as authorized by law. *See generally* Utah R. Jud. Admin. 11-201(6).

BACKGROUND[2]

¶2    In late 2013, Van Huizen committed a robbery with a friend and some acquaintances. At sixteen, Van Huizen was the youngest of the group; his friend was also a juvenile and their three acquaintances were adults. Although Van Huizen did not orchestrate the robbery, he agreed to it and facilitated the plan by providing guns from his family home.

¶3    In search of drugs, the group drove to the house of someone they knew would possess marijuana. They knocked on the back door, gained entry to the house and, brandishing the guns taken from Van Huizen's home, proceeded to rob the occupant of a cell phone, some cash, and a "little bit of weed." Though Van Huizen did not carry a firearm or other weapon, he was part of the group that entered the home and committed the robbery.

¶4    The State charged Van Huizen under the then-current Serious Youth Offender Act (the Act). *See generally* Utah Code Ann. § 78A-6-702 (LexisNexis Supp. 2013) (outlining the process by which a juvenile could be "bound over and held to answer in the district court in the same manner as an adult").[3] The Act required that the State charge any minor accused of certain serious felony offenses by filing a criminal information in

---

2. Van Huizen has already been convicted as an adult in district court. After his conviction, he successfully moved to reinstate the time to appeal the juvenile court's bindover order. Thus, this appeal concerns juvenile court proceedings and, on appeal, we recite the facts in the light most favorable to the juvenile court's decision. *See In re J.C.*, 2016 UT App 10, n.3, 366 P.3d 867.

3. The Utah Legislature amended the Act after the State brought these charges. We address the Act as it existed at the time of Van Huizen's juvenile court proceedings in 2013.

juvenile court. *Id.* § 78A-6-702(1). Once filed, the Act directed the court to undertake a two-pronged analysis. First, the State had "to establish probable cause" that the defendant committed the crime. *Id.* § 78A-6-702(3)(a). If the State proved probable cause, the burden shifted to the defendant to establish by clear and convincing evidence that "it would be contrary to the best interest of the minor and the best interests of the public to bind the defendant over." *Id.* § 78A-6-702(3)(d), (e).

¶5      In making the ultimate determination on whether to bind the juvenile over to district court, the Act directed that "the judge shall consider only" five factors:

> (i) whether the minor has been previously adjudicated delinquent for an offense involving the use of a dangerous weapon which would be a felony if committed by an adult;
> (ii) if the offense was committed with one or more other persons, whether the minor appears to have a greater or lesser degree of culpability than the codefendants;
> (iii) the extent to which the minor's role in the offense was committed in a violent, aggressive, or premeditated manner;
> (iv) the number and nature of the minor's prior adjudications in the juvenile court; and
> (v) whether public safety is better served by adjudicating the minor in the juvenile court or in the district court.

*Id.* § 78A-6-702(3)(c).

¶6      Under that framework, the Weber County Attorney's Office, acting on behalf of the State, charged Van Huizen in juvenile court with two counts of aggravated robbery and one count of aggravated burglary, all first degree felonies. Unbeknown to Van Huizen and his parents, the juvenile court

judge assigned to his case was married to the then-Chief Criminal Deputy in the Weber County Attorney's Office.

¶7      The juvenile court determined that the State had met its initial burden of proof and that there was probable cause to bind Van Huizen over to the district court as an adult. In response, Van Huizen put on evidence that both his and the public's interests were both best served by remaining in the juvenile system. Van Huizen and the State stipulated to factors one and four, namely that he had no prior offenses and therefore no offenses involving a dangerous weapon. On the other factors, Van Huizen adduced testimony from his mother and father relating to the stability of his home life, his generally good nature, and his bright future.

¶8      The juvenile court considered the evidence and determined that Van Huizen had only carried half of his burden. While Van Huizen had shown that his best interest was served by remaining in juvenile court, he had not shown by clear and convincing evidence that the public interests also favored retention. The court bound Van Huizen over to district court. Van Huizen did not timely appeal the bindover decision.

¶9      In district court, the same deputy county attorney that had handled the juvenile proceedings continued to prosecute Van Huizen, and the attorney received at least some assistance from the juvenile judge's husband, the Chief Criminal Deputy in the prosecutor's office. Van Huizen eventually pleaded guilty to two reduced counts of robbery, both second degree felonies. The district court sentenced him to concurrent prison terms of one to fifteen years. He was paroled in November 2014.

¶10      While he was serving his prison sentence, Van Huizen retained new counsel and moved in district court to reinstate his time to appeal the juvenile court's bindover order under *Manning v. State*, 2005 UT 61, 122 P.3d 628. He supported the motion by alleging that he had been denied his right to appeal the bindover order through ineffective assistance of counsel,

asserting that trial counsel had "misinformed [him] that the time for appeal had run" when it in fact had not. The State stipulated to Van Huizen's motion, and the district court reinstated his time to file an appeal. On that basis, Van Huizen now appeals the juvenile court's bindover order that initially transferred him into district court.[4]

## ISSUES AND STANDARD OF REVIEW

¶11 Van Huizen argues that the juvenile judge who bound him over was required to recuse herself under the Code of Judicial Conduct. "Determining whether a trial judge committed error by failing to recuse himself or herself under the Utah Code of Judicial Conduct . . . is a question of law, and we review such questions for correctness." *State v. Alonzo*, 973 P.2d 975, 979 (Utah 1998). Van Huizen also argues that the judge's "risk of bias" in his case was so strong that it "violated due process" under the United States Constitution. "Constitutional issues, including questions regarding due process, are questions of law that we review for correctness." *In re E.K.S.*, 2016 UT 56, ¶ 5 (citation and internal quotation marks omitted).

---

4. We note that, because Van Huizen's time to appeal the juvenile court's bindover decision was reinstated after it lapsed, he is taking this appeal on a more developed record than would normally be available. Specifically, we have before us a district court record that contains briefing, declarations, and other materials that were not part of the juvenile court proceedings and therefore would not have been available had this appeal been taken immediately following the bindover decision. This point is particularly salient as it applies to our resolution of this case, which turns on record information that—because of its introduction in district court after the bindover hearing—would have been unavailable to us had Van Huizen's appeal arrived in this court under the usual timeline.

¶12    Additionally, Van Huizen asserts that ineffective assistance of counsel and the doctrine of plain error require that we reverse the bindover order. Because we resolve this case on the disqualification issue, we do not address Van Huizen's other arguments.

ANALYSIS

¶13    Van Huizen argues that the juvenile court judge (the Juvenile Judge) who bound him over into adult court should have disqualified herself from his case because she was married to the Chief Criminal Deputy in charge of the criminal division in the Weber County Attorney's Office, the office that prosecuted him. He argues first that the Code of Judicial Conduct required the Juvenile Judge to recuse herself. Second, Van Huizen argues that he was denied constitutional due process due to the acute "risk of bias" inherent in the Juvenile Judge's relationship with the prosecuting office. The "general rule [is] that courts should avoid reaching constitutional issues if the case can be decided on other grounds." *West v. Thomson Newspapers*, 872 P.2d 999, 1004 (Utah 1994). We therefore address the Code of Judicial Conduct first, and because we resolve the appeal on that ground, we do not reach the constitutional question.

I. The Utah Code of Judicial Conduct

¶14    The Code of Judicial Conduct states that "[a]n independent, fair and impartial judiciary is indispensable to our system of justice." Utah Code Jud. Conduct, Preamble. As Justice Felix Frankfurter observed, courts possess "neither the purse nor the sword," so their authority "ultimately rests on sustained public confidence in [their] moral sanction." *Baker v. Carr*, 369 U.S. 186, 267 (1962) (Frankfurter, J., dissenting). That core principle is enshrined in our caselaw: "The purity and integrity of the judicial process ought to be protected against any taint of suspicion to the end that the public and litigants may have the

highest confidence in the integrity and fairness of the courts." *Haslam v. Morrison*, 190 P.2d 520, 523 (Utah 1948).

¶15 The Code lists the conditions under which a judge must recuse or disqualify himself or herself.[5] Generally, "[a] judge should act at all times in a manner that promotes—and shall not undermine—public confidence in the independence, integrity, and impartiality of the judiciary and shall avoid impropriety and the appearance of impropriety." Utah Code Jud. Conduct R. 1.2. Specifically, "[a] judge shall disqualify himself or herself in any proceeding in which the judge's impartiality might reasonably be questioned."[6] *Id.* R. 2.11(A); *accord Dahl v. Dahl*, 2015 UT 79, ¶ 49 ("A judge should be disqualified when circumstances arise in which the judge's 'impartiality might reasonably be questioned.'" (quoting *State v. Gardner*, 789 P.2d 273, 278 (Utah 1989))).

¶16 Rule 2.11(A) contains an illustrative, but not exhaustive, list of disqualifying circumstances. In some circumstances, the judge's duty to recuse is absolute. For instance, if "[t]he judge has a personal bias or prejudice concerning a party or a party's lawyer," he or she must disqualify. Utah Code Jud. Conduct R. 2.11(A)(1); *see also id.* R. 2.11(C) (establishing that the presence of actual bias or prejudice cannot be waived). In other

---

5. The terms "recuse" and "disqualify" are generally synonymous. *See In re School Asbestos Litigation*, 977 F.2d 764, 769 n.1 (3d Cir. 1992) ("Whether or not there was ever a distinction between disqualification and recusal, the courts now commonly use the two terms interchangeably.").

6. The Code of Judicial Conduct defines "impartial" to mean the "absence of bias or prejudice in favor of, or against, particular parties or classes of parties, as well as presence of an objective and open mind in considering matters that come before a judge." Utah Code Jud. Conduct, Terminology.

circumstances, the judge must recuse unless he or she "disclose[s] on the record the basis of the judge's disqualification" and "the parties and lawyers agree . . . that the judge should not be disqualified." *Id.* R. 2.11(C). If the parties agree to such a waiver, it "shall be incorporated into the record of the proceeding." *Id.*

¶17 Circumstances requiring disqualification absent waiver include:

> The judge knows that the judge, the judge's spouse or domestic partner, or a person within the third degree of relationship to either of them, or the spouse or domestic partner of such a person is:
>    (a) a party to the proceeding, or an officer, director, general partner, managing member, or trustee of a party;
>    (b) acting as a lawyer in the proceeding;
>    (c) a person who has more than a de minimis interest that could be substantially affected by the proceeding . . . .

*Id.* R. 2.11(A)(2). Further, a judge "is disqualified whenever the judge's impartiality might reasonably be questioned, regardless of whether any of the specific [listed disqualifying circumstances] apply." *Id.* R. 2.11 cmt. 1. And the judge bears ultimate responsibility for ensuring that the integrity of the process is protected: "A judge's obligation not to hear or decide matters in which disqualification is required applies regardless of whether a motion to disqualify is filed." *Id.* R. 2.11 cmt 2; *accord Regional Sales Agency, Inc. v. Reichert*, 830 P.2d 252, 257 n.7 (Utah 1992) (holding that it "was [the judge's] responsibility to identify her relationship . . . and take appropriate measures to recuse herself," not the responsibility of counsel).

¶18 Thus, when a judge knows of circumstances that give rise to the reasonable appearance of bias, the judge is under an affirmative duty either to recuse or to disclose the facts that contribute to an appearance of partiality and allow the parties to

decide whether to waive disqualification. Indeed, "[a] judge should disclose on the record information that the judge believes the parties or their lawyers might reasonably consider relevant to a possible motion for disqualification, even if the judge believes there is no basis for disqualification." Utah Code Jud. Conduct R. 2.11 cmt. 5. Hence, even if the judge believes that recusal is not warranted under a given set of circumstances, it is better to disclose facts that might reasonably raise a question about impartiality and allow the parties to either waive the issue or file a motion for disqualification that will then be resolved by an independent judicial officer. *See* Utah R. Crim. P. 29(c)(2) (explaining that a motion to disqualify must either be granted or referred to a different judicial officer for disposition).

¶19   "The Utah Supreme Court has found the provisions of the Code of Judicial Conduct to have legal force." *American Rural Cellular, Inc. v. Systems Commc'n Corp.*, 939 P.2d 185, 195 n.12 (Utah Ct. App. 1997); *see also Cheek v. Clay Bulloch Constr. Inc.*, 2016 UT App 227, ¶ 19, 387 P.3d 611 (collecting cases). For instance, in *Regional Sales Agency, Inc. v. Reichert*, the supreme court held that an appearance of impropriety under the Judicial Code of Conduct "[was] sufficient to dispose of the case." 830 P.2d at 257–58.

¶20   In Utah law, as under federal law, the question of a judge's impartiality is determined from the viewpoint of "'a reasonable person, knowing all the circumstances.'" *West Jordan City v. Goodman*, 2006 UT 27, ¶ 22, 135 P.3d 874 (quoting 13A Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice and Procedure* § 3549 (2d ed. 1984 & supp. 2005)).[7]

---

7. The federal analogue to the Code of Judicial Conduct is codified at 28 U.S.C. § 455 (2012). Although the Utah rules and the federal statute do not use identical language, "[s]ection 455(a)," like the Utah code, "is based upon the [ABA Model] Code of Judicial Conduct, which clearly imposes a 'reasonable

(continued…)

As the United States Court of Appeals for the Tenth Circuit explained, "The reasonable observer is not the judge or even someone familiar with the judicial system, but rather an average member of the public." *Mathis v. Huff & Puff Trucking, Inc.*, 787 F.3d 1297, 1310 (10th Cir. 2015). "In conducting this [reasonable person] review, we must ask how these facts would appear to a well-informed, thoughtful and objective observer, rather than [a] hypersensitive, cynical, and suspicious person." *Id.* (citation and internal quotation marks omitted).

¶21 We now turn to the question in this case—whether there was a reasonable question as to the impartiality of the Juvenile Judge under the circumstances. If so, we must then determine whether the appearance of partiality requires vacatur of the bindover order and reconsideration by another judge.

A.  Appearance of Partiality

¶22 We note at the outset that our thorough review of the record gives us no reason to think the Juvenile Judge was actually biased against Van Huizen. However, as we discussed above, the Code of Judicial Conduct requires a judge's disqualification under many circumstances that fall short of actual bias, such as situations where a reasonable person would question the judge's impartiality. In this case, it is uncontested that the Juvenile Judge that bound Van Huizen over for prosecution in district court was married to the Chief Criminal Deputy in the Weber County Attorney's Office. It is also uncontested that the Juvenile Judge did not disclose that information to the parties on the record.

---

(…continued)

person' test for recusal." 13D Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice and Procedure* § 3549 (3d ed. supp. 2016). Thus, we consider federal cases addressing the "reasonable person" standard helpful to our analysis.

¶23    Van Huizen argues that the spousal relationship required the Juvenile Judge to disqualify herself under rule 2.11. The rule requires recusal where, among other things, the judge's spouse is "a party to the proceeding, or an officer, director, general partner, managing member, or trustee of a party." Utah Code Jud. Conduct R. 2.11(A)(2)(a). Van Huizen asserts that the Chief Criminal Deputy was "properly considered an officer, director or managing member of a party"—in this case, the State. Van Huizen does not, however, explain that argument in detail. He apparently relies instead on the plain language, arguing that the Chief Criminal Deputy obviously was among the class of people denoted in rule 2.11 for which a spousal relationship with the judge created the appearance of partiality.

¶24    The State argues in response that the Chief Criminal Deputy was not covered under the plain language of the rule because he was not "an 'officer, director, general partner, managing member, or trustee' of the State of Utah in the sense that those terms are used in rule 2.11." The State does not explain precisely in what sense the rule uses those terms, but the point seems to be based on the distinction between government entities and corporate entities. That is, terms such as "general partner," "managing member," and "trustee" suggest positions within a private entity or corporate structure, not within a government body. Accordingly, the State's position appears to be the inverse of Van Huizen's—that the Chief Criminal Deputy's position is categorically outside the scope of rule 2.11(A)(2)(a).

¶25    We are not persuaded that the plain language of rule 2.11(A)(2)(a) answers the question presented. Taking just one term as an example, "officer" applies to both governments and private entities. For instance, "officer" is defined broadly as "anyone elected or appointed to an office or position of authority in a government, business, institution, society, etc." *Officer*, Webster's New World College Dictionary 1015 (5th ed. 2016). Similarly, Black's defines "officer" as "[s]omeone who holds an

office of trust, authority, or command." *Officer*, Black's Law Dictionary 1257 (10th ed. 2014) (explaining that, in public affairs, an officer is someone who holds a public government office and is "authorized by that government to exercise some specific function"). These definitions make clear the concept of an "officer" is broader than the State acknowledges and could apply to a position like the Chief Criminal Deputy's.

¶26 But on the other hand, the plain language of rule 2.11(A)(2)(a) does not clearly apply to the Chief Criminal Deputy either. While the Chief Criminal Deputy is undoubtedly authorized by the government to "exercise a specific function," it is unclear whether he was "elected or appointed" to his position of authority as understood by the term's definition. For instance, it is likely that the Weber County Attorney—the Chief Criminal Deputy's boss—would be properly considered an officer under the plain meaning of the term. Utah Code Ann. § 17-53-101(1) (LexisNexis 2013) (enumerating the county attorney as one of the "elected officers of a county"). However, it does not automatically follow that the Weber County Attorney's Chief Criminal Deputy is likewise an officer of the State for purposes of the rule.

¶27 We are not persuaded that rule 2.11(A)(2)(a)'s language either plainly applies or plainly does not apply to the Chief Criminal Deputy. Rather, rules 2.11(A)(2)(b) and (c), which trigger recusal when a judge's spouse is "acting as a lawyer in the proceeding" or "has more than a de minimis interest that could be substantially affected by the proceeding," seem more applicable. Relevant cases have often employed these concepts in addressing similar conditions, and we accordingly now consider how disqualification rules have been addressed in like circumstances. In doing so, we keep in mind a consideration we discussed earlier—that the disqualification rule is meant to be applied broadly "whenever the judge's impartiality might reasonably be questioned, regardless of whether any of the

specific [listed disqualifying circumstances] apply." Utah Code Jud. Conduct R. 2.11 cmt. 1.

1. Applicable Caselaw

¶28 We are aware of no published Utah decisions that analyze a relationship like the one at issue here, where the judge is closely related to an attorney who is not directly involved in the proceedings before the judge, but is nonetheless a supervisor in the public law office of the attorney handling the case in court. In the absence of Utah precedent, Van Huizen directs our attention to a Colorado case, *Smith v. Beckman*, 683 P.2d 1214 (Colo. App. 1984). In *Beckman*, a county court judge was married to a deputy district attorney who "handle[d] matters exclusively in the district court," a separate court from the judge's own. *Id.* at 1215. The criminal defendant in *Beckman*, originally scheduled for trial in county court before the county judge, requested a writ from the district court to prevent the county judge from presiding over his trial. He argued that the judge's spousal relationship to a prosecutor justified disqualification. *Id.* Even though the attorney spouse was not an active lawyer on the case, the district court found that "the powers of a deputy district attorney are akin to that of a partner in a private law firm," and thus the judge's recusal was necessary. *Id.*

¶29 On appeal, the Colorado Court of Appeals rejected that analysis and held that a deputy district attorney is not like a partner at a law firm "because his compensation and clientele are set, and the prestige of the office as a whole is not greatly affected by the outcome of a particular case." *Id.* at 1216. However, the court nevertheless held "that the husband-wife relationship" required recusal. *Id.* at 1215. The court reasoned that,

> Generally, the public views married people as "a couple," as "a partnership," and as participants in a relationship more intimate than any other kind of relationship between individuals. In our view the

existence of a marriage relationship between a judge and a deputy district attorney in the same county is sufficient to establish grounds for disqualification, even though no other facts call into question the judge's impartiality.

*Id.* at 1216. The appellate court reached that conclusion even though the county judge and the district attorney "[had] drafted guidelines designed to further insulate [the attorney spouse] from all contact with any county court cases." *Id.* at 1215. Thus, the *Beckman* court determined that the spousal relationship is so close in nature that it outweighs other factors, including the screening procedure implemented by the county attorney's office and the manifest distinctions between private and public law firms.

¶30 The State counters with a more recent Minnesota Court of Appeals case, *In re Jacobs*, 791 N.W.2d 300 (Minn. Ct. App. 2010). In *Jacobs*, as in *Beckman*, Jacobs argued that "the assigned judge's impartiality can reasonably be questioned based on his spouse's employment with the [prosecuting] County Attorney's Office." *Id.* at 301. And like Van Huizen in this case, Jacobs based his claim on rule 2.11 of the Minnesota Code of Judicial Conduct, which is functionally identical to our own rule 2.11. *Compare* Utah Code of Jud. Conduct R. 2.11(A)(2), *with* Minnesota Code of Jud. Conduct R. 2.11(A)(2).

¶31 The appellate court rejected Jacobs' argument, concluding that "Jacobs has not shown that the judge's impartiality can reasonably be questioned." *Id.* at 302. "Assuming that a judge's spouse is not personally involved in a case, the personal interest, if any, of the judge's spouse in the prosecution of that case to conviction would be de minimis" and would not call for disqualification. *Id.* at 302. That reasoning was based, in part, on the fact that the "[Hennepin] County Attorney's Office is a large

office that prosecutes a large volume of cases."[8] *Id.* The court also noted "that prosecutors are not merely advocates but also 'ministers of justice' charged with protecting the rights of the accused as well as the rights of the public." *Id.* (citation omitted). Finally, as the State notes, the *Jacobs* court specifically analyzed *Beckman* and determined that the "trend of the case law has been against the holding in *Beckman*." *Id.* Specifically, the court's analysis of other holdings led it to conclude the "closeness of the marital relationship, relied on in *Beckman*, is counter-balanced by the institutional aspects of employment in a public law firm such as a county attorney's office." *Id.*

¶32 We agree with the Minnesota Court of Appeals that *Beckman* is a relative outlier in the caselaw governing when a judge must disqualify based on a spousal relationship with an attorney in the relevant prosecuting office. For example, in *State v. Harrell* the Wisconsin Supreme Court held that a judge's recusal from a case was not required simply because his wife was an assistant district attorney in same county. 546 N.W.2d 115, 118 (Wis. 1996). Likewise, in *Sensley v. Albritton* the United States Court of Appeals for the Fifth Circuit rejected an argument that a judge should have recused himself because his "spouse was an Assistant District Attorney in the office of [the] District Attorney . . . , whose office also represented the Defendants" in the case. 385 F.3d 591, 598 (5th Cir. 2004).

¶33 Although we agree that *Beckman* sets a relatively strict standard for disqualification compared to other cases dealing with similar facts, we note that none of the cases taking a more lenient approach, nor *Beckman* itself, involved an attorney spouse with supervisory authority within the government office in question. Indeed, the arguments for disqualification rejected by appellate courts have generally been based on the assertion that

---

8. Hennepin County includes within its boundaries the city of Minneapolis.

government agencies are akin to private firms for purposes of judicial disqualification; the arguments have not focused on the particular responsibilities of the spouse—such as a managerial role—that raise more specific concerns.[9] For these reasons, we find the approach taken in *Beckman* to be of limited use in our resolution of this case.

¶34   However, the State's reliance on the facts and reasoning of *In re Jacobs* is likewise misplaced because the prosecutor spouse in *Jacobs* was not a supervisor within the county prosecutor's office like the Chief Criminal Deputy was in this case. In addition, the *Jacobs* court relied on the size of the district attorney's office as an insulating factor that diminishes a judge spouse's appearance of partiality, a factor that holds far less sway here. In *Jacobs*, the court noted that the Hennepin County Attorney's Office was "a large office that prosecutes a large volume of cases," 791 N.W.2d at 302, whereas here we are

---

9. We find no reason to disagree with the majority of decisions that have determined that, due to the differences in both institutional and economic incentives, a group of government attorneys is not necessarily similar to a group of private attorneys for the purposes of the judicial disqualification of a spouse. *See Smith v. Beckman*, 683 P.2d 1214, 1216 (Colo. App. 1984) (holding that, unlike a public attorney, "[a] partner in a law firm is said to be 'engaged' in every case in which a member of his firm represents a party, primarily because he has a financial interest in the outcome of the case"); *In re Jacobs*, 791 N.W.2d 300, 302 (Minn. Ct. App. 2010) (noting the institutional difference between prosecutorial offices and private firms); *accord Regional Sales Agency, Inc. v. Reichert*, 830 P.2d 252, 258 n.8 (Utah 1992) (citing favorably *Beckman*, 683 P.2d at 1216, for the proposition that public attorneys typically do not benefit from a judge's decision in the way that some private attorneys do).

addressing the substantially smaller Weber County Attorney's Office.[10]

¶35    Thus, while we are not inclined to follow the Colorado decision in *Smith v. Beckman*, as Van Huizen urges, we are not persuaded by the State that the Minnesota Court of Appeals approach from *In re Jacobs* is fully applicable here, either.

2.    The Pertinent Facts

¶36    Having discovered no precedent to guide our resolution of these particular circumstances—where a judge is married to an attorney with a supervisory role within the office prosecuting the case—we consider the specific circumstances at issue here.

¶37    It is uncontested that the Juvenile Judge did not disclose her relationship to the Chief Criminal Deputy in the Weber County Attorney's Office during the juvenile phase of the case and Van Huizen learned of the relationship only after he was bound over as an adult.[11] As a consequence, no knowing and

---

10. "As the largest public law office in Minnesota, with more than 400 employees, [the Hennepin County Attorney's Office] handle[s] tens of thousands of adult felony, juvenile and civil cases each year." *2015 Highlights*, Hennepin County Attorney, http://www.hennepinattorney.org/highlights2015 [https://perma. cc/NV6H-6EEE]. *See also* QuickFacts, Hennepin County, Minnesota, United States Census Bureau, http://www.census. gov/quickfacts/table/PST045215/27053,49057 [https://perma.cc/ 8VVM-E3CK] (comparing the July 1, 2015 populations of Hennepin County (1,223,149) and Weber County (243,645)).

11. We acknowledge that the Juvenile Judge may have assumed that the litigants, or more probably their lawyers, were generally aware that her husband was the Chief Criminal Deputy and that the lawyers would raise a concern if one were warranted. We

(continued…)

voluntary waiver of any perceived partiality could have occurred here, nor did Van Huizen have the facts necessary to move to disqualify the Juvenile Judge.[12] Further, the record shows that the Chief Criminal Deputy had at least some involvement in Van Huizen's case once he was bound over to the district court. For instance, the Chief Criminal Deputy himself responded on behalf of the Weber County Attorney to communications from Van Huizen's current counsel when counsel substituted into the case. In addition, the district court's docket shows that the Chief Criminal Deputy requested digital copies of several proceedings, on behalf of either himself or a colleague, on the same day that his spouse signed the bindover order.

¶38    The record does not reveal the specific nature of the relationship between the Chief Criminal Deputy and the deputy county attorney who actually handled Van Huizen's case. The only information contained in the record on that point comes

---

(…continued)

agree with the Vermont Supreme Court, however, that "[i]t is not appropriate to make such an assumption." *Velardo v. Ovitt*, 2007 VT 69, ¶ 29 n.3, 933 A.2d 227 (addressing a situation where "the assistant judge [may have] thought that the litigants or their lawyers were generally aware of the sibling relationship" between the judge and a guardian ad litem). This is particularly the case given that it is the party's decision, in consultation with counsel, whether to waive a potential conflict, not the attorney's. *See* Utah Code Jud. Conduct R. 2.11(C) (allowing waiver only if the "parties and lawyers agree" to waive, and incorporate the agreement into the record).

12. In a sworn declaration, Van Huizen stated that, "If I had known" that the Juvenile Judge "[was] married to the Chief Deputy of the Criminal Division," "I would have requested a different judge who had no ties to the office prosecuting me."

from a brief filed in district court after the bindover in question. In that filing, the State represented that the Chief Criminal Deputy "does not supervise the attorneys in juvenile court; he does not screen cases in juvenile court and is not involved in juvenile court matters, those responsibilities are under the purview of other attorneys."

¶39   We accept that characterization of the Chief Criminal Deputy's role in the juvenile court proceeding. And while we accept the State's general characterization of the workflow in the Weber County Attorney's Office, we also note that on appeal the State does not contest Van Huizen's basic premise, namely that his juvenile bindover hearing was criminal in nature. *See* Utah Code Ann. § 78A-6-702(1) (providing that actions against minors accused of crimes like the one at issue here "shall be [filed] by criminal information"). That premise suggests that the attorney handling the matter in juvenile court interacted with the Chief Criminal Deputy's at some level, even if the chain of command had an additional supervisory layer while the case was in juvenile court.

¶40   The record before us seems to confirm that inference. For example, a single county prosecutor represented the State throughout this case, first in the juvenile court and then in the district court after bindover. Particularly given that the Chief Criminal Deputy had at least some involvement with the case once it reached district court and there is no evidence in the record of a screening procedure, it seems unlikely that the Chief Criminal Deputy was completely walled off from the juvenile court proceedings in Van Huizen's case. Similarly, we cannot conclude that there was a separation of any substance between the juvenile and the adult proceedings—Van Huizen's entire case appears to have occurred within the same organizational line at the county attorney's office. Indeed, the case attorney and the Chief Criminal Deputy apparently worked together on the case once it arrived in district court. Therefore, because he was head of the criminal division of the Weber County Attorney's

Office and the same attorney represented the State throughout Van Huizen's prosecution in juvenile and district court, it is reasonable to conclude that the Chief Criminal Deputy was in the chain of command over the attorney handling the juvenile side of the case, even if he did not supervise the juvenile portion directly.

¶41 In any event, the overall goal of the county attorney's office was to move Van Huizen from juvenile court to district court by means of the bindover proceeding—from a forum where the Chief Criminal Deputy may have had some attenuated role to one where it is clear the Chief Criminal Deputy exercised supervisory authority. With this backdrop in mind, we now consider the nature of various positions within the county attorney command hierarchy as they relate to the question before us.

3.      Implications of the County Attorney's Chain of Command

¶42 We begin our analysis at one end of the chain of command, with the proposition that the Juvenile Judge would have been obligated to recuse had the Chief Criminal Deputy actually appeared in or worked on Van Huizen's juvenile case directly—that is, if he had been a counsel of record. Under rule 2.11(A)(2)(b), disqualification is required in any situation where the judge's spouse is "acting as a lawyer in the proceeding."

¶43 Similarly, at the other end of the chain of command, there is little question that the Juvenile Judge would have been obligated to recuse if her spouse was the Weber County Attorney himself—the Chief Criminal Deputy's boss—for at least three reasons. First, a county attorney appears to be within the class of officers of a party explicitly covered by the Code of Judicial Conduct. *Compare* Utah Code Ann. § 17-18a-301(1) (LexisNexis 2013) (stating that "[t]he county attorney is an elected officer"), *with* Utah Code Jud. Conduct R. 2.11(A)(2)(a) (requiring a judge to recuse when her spouse is "an officer . . . of a party").

¶44   Second, a county attorney seems to be among the class of persons who have "more than a de minimis interest that could be substantially affected by the proceeding." Utah Code Jud. Conduct R. 2.11(A)(2)(c).[13] This is because, as the elected official in charge of prosecutions for the county, the county attorney is ultimately responsible for individual case outcomes. *See* Utah Code Ann. § 17-53-106(1)(b) (LexisNexis 2013) (making "the management of deputies and other employees" one of the professional duties of a county attorney). Further, we note that a county attorney's office is tied directly to the ballot box, and although individual votes may be subject to a wide variety of influences, a candidate's perceived performance in office is certainly among the factors that are likely to inform electoral choice. And while we recognize that voters do not often choose to either support or disavow a given candidate based on the outcome of individual cases such as this, case outcomes as a whole certainly can affect voter choice. Thus, although not at the same level as a member of a private law firm with a direct economic interest in case outcomes, the county attorney's interest in the results of his staff's work is not simply de minimis.

¶45   Third, the county attorney typically makes an appearance in every case brought by his or her office. *Compare* Utah Code Ann. § 17-18a-202(1)(a) (LexisNexis 2013) (making the county attorney a "public prosecutor for the county"), *with id.* § 17-18a-401(1) (mandating that a public prosecutor "shall . . . conduct, on behalf of the state, all prosecutions for a public offense committed within a county"). The county attorney is therefore typically counsel of record in every criminal case because it is on his behalf that his attorney-staff charges defendants and prosecutes cases. *See* New York Adv. Comm. on Jud. Ethics Op.

---

13. "'De minimis,' in the context of interests pertaining to disqualification of a judge, means an insignificant interest that could not raise a reasonable question regarding the judge's impartiality." Utah Code Jud. Conduct, Terminology.

07-216 (Dec. 4, 2008), http://www.nycourts.gov/ip/judicialethics/opinions/07-216.htm [http://perma.cc/WFS5-GSFM] (determining that a judge whose sibling was the district attorney "must disqualify him/herself" because "the District Attorney . . . is involved either directly or indirectly in all criminal cases prosecuted in the county where the judge presides"). As a consequence, the Juvenile Judge would have been obligated to recuse had she been married to the county attorney for the same reason that she would have been required to recuse if she were married to the case attorney—they are both "acting as a lawyer in the proceeding." Utah Code Jud. Conduct R. 2.11(A)(2)(b).

¶46    Thus, the Juvenile Judge would have been obligated to recuse herself if her husband had been on either end of the chain of command—trial counsel or county attorney. But in this case, the Chief Criminal Deputy was somewhere in the space between, where the determination is less clear. Here, we turn again to the basic purpose of the Code of Judicial Conduct, which is meant to be read broadly to protect "[t]he purity and integrity of the judicial process . . . against any taint of suspicion to the end that the public and litigants may have the highest confidence in the integrity and fairness of the courts." *Haslam v. Morrison*, 190 P.2d 520, 523 (Utah 1948). The Chief Criminal Deputy, by the nature of his position, is responsible to the County Attorney for the performance of the attorneys below him in the supervisory line. And given that the Juvenile Judge would have been required to recuse if she had been married to either the Chief Criminal Deputy's subordinate or the Chief Criminal Deputy's superior, we believe that, in a public law office, the command hierarchy itself is material to the appearance of partiality. Thus, because we have determined that the Chief Criminal Deputy was within the chain of command for this case, we conclude that his marriage to the Juvenile Judge created an appearance of partiality.

¶47    While we are aware of no reported cases that are directly on point, several state ethics opinions have relied on a similar analysis.

> There can be no debate over the inappropriateness of a judge hearing cases involving the office of a District Attorney when the elected District Attorney is a close relative of the judge . . . . Likewise, a disinterested person would reasonably conclude that the professional relationship between a District Attorney and his or her Chief Assistant is such that the same standard applies when the judge is a close relative of the District Attorney's Chief Assistant or another District Attorney with a supervisory role.

Georgia Jud. Ethics Op. No. 238, 2013 WL 9638986, at *3 (May 1, 2013); *see also, e.g.,* New York Jud. Adv. Op. 10-05, 2010 WL 8149118, at *1 (Mar. 2, 2010) (explaining that "the Committee previously has advised that a judge must disqualify him/herself when the judge's spouse holds a supervisory position in a public law office"). Indeed, there is support for the proposition that a chief criminal deputy may present a greater concern than the county attorney himself, because the chief criminal deputy is more directly responsible for prosecutorial functions. The New York Advisory Committee on Judicial Ethics explained that,

> in this instance, the [judge's] spouse is in a position just below the attorney-in-chief, to whom he/she reports, and it is the spouse who bears the responsibility of overseeing all criminal practice operations including the very operations involved herein: State criminal trial proceedings. Thus the judge's spouse is more closely connected to the matters before the judge than the attorney-in-chief.

New York Adv. Comm. on Jud. Ethics Op. 05-87 (Dec. 8, 2005), http://www.nycourts.gov/ip/judicialethics/opinions/05-87.htm [http://perma.cc/PL27-TSZ2].

¶48 For these reasons, we conclude that, because he was in the direct chain of command between County Attorney and the attorney prosecuting this case, the Chief Criminal Deputy falls within the class of persons who can create an appearance of partiality that requires a judge spouse to, at a minimum, obtain informed consent from the parties to preside as provided by rule 2.11(C). In keeping with the majority of jurisdictions, our holding does not extend to a judge's relationship with attorneys who merely work in the same public office as the attorney appearing before the judge.[14] Likewise, our holding does not exclude the possibility that thoughtful screening procedures in a public office could sufficiently protect a judge married to a

14. Our conclusion that there was an appearance of partiality here might be different if, for instance, the Juvenile Judge's spouse was the supervisor of the civil division of the Weber County Attorney's Office rather than the criminal division. In that situation, where the prosecuting attorney was part of a different command hierarchy than the attorney spouse, the separation between the divisions would likely be a significant distinction from the circumstances here with regard to questions concerning a judge's disqualification. *Cf.* Utah Jud. Ethics Informal Op. No. 94-6, 1995 WL 17935846, at *2 (advising that a judge's marriage to an assistant attorney general did not automatically require recusal from cases involving a different assistant attorney general "due to the . . . the divisional organization" of the office, among other reasons like the office's size and geographic dispersion). *But see* Utah Jud. Ethics Informal Op. No. 88-3, 1988 WL 1582480, at *3 (advising that a judge's marriage to a public defender working at the Legal Defender Association required recusal "in all cases where LDA is the attorney of record," regardless of whether the judge's spouse worked on the individual case, in part because of the relatively small size of the office which "functions like a private law office in that case information and strategies are shared among attorneys").

prosecutor from the appearance of partiality, but there is no indication that any were in place here. In any event, as we have discussed, it is important to err on the side of disclosure when considering relationships that could give rise to the reasonable appearance of partiality, and no such disclosure occurred on the record in this case.

B.      Prejudice Requirement

¶49    We have concluded that the Juvenile Judge's marriage to the Chief Criminal Deputy created an appearance of partiality. But under the unusual circumstances of this case, which reaches us late in the proceedings after a successful *Manning* motion, Van Huizen has already been bound over for trial in the district court by the Juvenile Judge and convicted as an adult. We therefore must determine if any remedy is available to Van Huizen based on the Juvenile Judge's appearance of partiality.

¶50    Van Huizen argues that "the appearance of impropriety" in his case "requires reversal of the bindover order." The State counters that, even if the Juvenile Judge should have recused based on her marital relationship with the prosecutor's office, Van Huizen "has not shown prejudice, as he must."[15] The key

---

15. The State asserts that we must conduct a plain error review on this issue. However, plain error is an exception to the preservation rule, which generally requires that claims be raised in the lower court before being raised on appeal. *See State v. Holgate*, 2000 UT 74, ¶ 11, 10 P.3d 346 (recognizing "plain error" as an exception to the preservation rule). It is true that the Juvenile Judge's appearance of partiality was not raised in the juvenile court. However, it is also true that the preservation rule assumes that the appealing party had the opportunity to object in the first instance. Here, the record indicates that Van Huizen did not have such an opportunity because he did not have knowledge of the relevant facts at the time of the bindover

(continued…)

difference between the two positions—and thus the key to whether Van Huizen is entitled to relief—turns on the question of whether a showing of prejudice is necessary for the remedy sought in this case.

¶51 Utah law is unsettled on the question of whether an appellant must show prejudice when a judge's relationship constituted an appearance of partiality, with two apparently diverging approaches. One line of cases imposes a prejudice requirement on appeal. For instance, our supreme court has held that "[f]ailure to observe [the recusal standard in the Code of Judicial Conduct] may subject the judge to disciplinary measures. However, that does not necessarily mean that the defendant is entitled to a new trial." *State v. Neeley*, 748 P.2d 1091, 1094 (Utah 1988). Building on that decision, the court concluded in *State v. Gardner* that a judge's failure to recuse, even

---

(…continued)

decision. Thus, we conclude that plain error is not the proper framework for our review. *See In re D.B.*, 2012 UT 65, ¶ 34, 289 P.3d 459 (noting parenthetically that the preservation rule "does not apply where the question did not exist or could not be raised below" (citation and internal quotation marks omitted)). Furthermore, the State's argument implies that a defendant has a duty to investigate and preserve appearance of partiality issues in the first instance. Certainly, a defendant must timely raise any questions of this sort that he is aware of from whatever source. *See* Utah R. Crim. P. 29(c)(1)(B)(iii) (requiring a disqualification motion to be filed not later than twenty-one days after "the date on which the moving party learns or with the exercise of reasonable diligence should have learned of the grounds upon which the motion is based"). But, as we have discussed, it is the judge's duty to disclose facts relevant to disqualification in the first instance. In any event, the State's larger point—that some Utah law supports the proposition that Van Huizen must show prejudice—is nonetheless accurate, and we address that below.

in circumstances where he should have done so, was subject to harmless error analysis. 789 P.2d 273, 278 (Utah 1989). Later, in *State v. Alonzo*, the supreme court reiterated that a judge's "failure to recuse himself or herself does not automatically entitle a defendant to a new trial." 973 P.2d 975, 979 (Utah 1998). Relying on *Gardner* for the proposition that "the appearance of bias may be grounds for reversal if actual prejudice is shown," the *Alonzo* court concluded that "[a]ctual prejudice can be shown when there exists a reasonable likelihood that the result would have been more favorable for the defendants absent the trial judge's appearance of bias." *Id.* (citing *Gardner*, 789 P.2d at 278).

¶52 Another case, however, indicates that a prejudice showing is not always required. In *Regional Sales Agency, Inc. v. Reichert*, the supreme court addressed an appearance of impropriety involving a member of this court. 830 P.2d 252 (Utah 1992). On certiorari, the *Reichert* court addressed a situation where one of the judges on a panel deciding the case was related through marriage to two partners at the firm that argued it. *Id.* at 254. As with the proceedings at the juvenile level in this case, the *Reichert* record contained no suggestion that the related attorneys "participated in [the] case at any time." *Id.* at 255. Also like this case, the petitioner did not "contend[] that [the judge's] failure to disqualify herself was intentional or malicious." *Id.* at 255. Instead, the petitioner simply argued that the "[judge's] participation create[d] an appearance of impropriety." *Id.* The supreme court agreed and, without conducting a prejudice analysis, "vacate[d] the court of appeals' decision and remand[ed] to the court of appeals for rehearing of the substantive issues." *Id.*

¶53 We believe that the apparent conflict between these precedents can be reconciled because there are several obvious differences between this case and the cases that required a showing of prejudice. First, the procedural posture is different. Unlike this case, the cases that required showing prejudice involved situations where the facts constituting the judge's

alleged appearance of bias where known and brought to the lower court's attention. *E.g.*, *Gardner*, 789 P.2d at 278 ("Defendant filed an affidavit of bias and prejudice against the trial judge because he worked in the [court building where the crime took place]."); *Neeley*, 748 P.2d at 1093 ("Defendants filed a pretrial motion to disqualify [the judge] from presiding at their trial."); *State v. Alonzo*, 932 P.2d 606, 610 (Utah Ct. App. 1997) ("After these alleged comments were made, defense counsel filed a motion for the trial judge to recuse himself and submitted affidavits detailing their versions of the trial judge's comments."), *aff'd*, 973 P.2d 975 (Utah 1998). Thus, in instances where the supreme court has required a showing of prejudice to grant a new trial, the complaining party had already tried—but failed—to disqualify the trial judge using appropriate procedural mechanisms, such as Utah Rule of Criminal Procedure 29.[16]

¶54　The supreme court acknowledged the importance of that point in *Neeley* when it stated, "absent a showing of actual bias or an abuse of discretion, failure to [disqualify] does not constitute reversible error as long as the requirements of [rule

---

16. Utah Rule of Criminal Procedure 29(c) outlines the process by which a party may move to disqualify a judge based on "bias or prejudice, or conflict of interest." The judge against whom the motion is directed must either grant the motion or certify it to a reviewing judge for decision. Utah R. Crim. P. 29(c)(2). "If the reviewing judge finds that the motion and affidavit are timely filed, filed in good faith and legally sufficient, the reviewing judge shall assign another judge to the action . . . ." *Id.* R. 29(c)(3)(A). Rule 29 applies in juvenile court. Utah R. Juv. P. 57(e) (incorporating a party's rights under rule 29 of the Rules of Criminal Procedure into the rules of juvenile procedure).

29] are met." 748 P.2d at 1094–95.[17] *See also State v. Ontiveros*, 835 P.2d 201, 204 (Utah Ct. App. 1992) ("Because the trial judge precisely followed the provisions of Rule 29, [the appellant] must show actual bias or an abuse of discretion in order to prevail on this point."). And in *Alonzo*, the supreme court explained that point further. "The trial judge in this case complied exactly with rule 29. After he had been approved to continue [with the case], the burden shifted to the petitioners to show actual bias or abuse of discretion." *Alonzo*, 973 P.2d at 979 (citing *Neeley*, 748 P.2d at 1094–95, and affirming this court's decision on that point).

¶55   Based on *Alonzo* and *Neeley*, it appears that a failed attempt to disqualify a trial judge may be a prerequisite to requiring a showing of prejudice on appeal. As we understand it, this burden shifting rationale makes sense. In the first instance, it is the judge's duty to either recuse sua sponte or disclose the facts that might give rise to an appearance of partiality. Once the facts have been disclosed, the defendant may either waive the appearance of partiality or move to disqualify the judge under Utah Rule of Criminal Procedure 29, which imposes a timeliness requirement on the movant.[18] Assuming

---

17. In *Neeley*, the procedural mechanism in play was codified at Utah Code section 77-35-29. However, as this court noted in *State v. Ontiveros*, 835 P.2d 201, 204 (Utah Ct. App. 1992), rule 29 of the Utah Rules of Criminal Procedure is section 77-35-29's current analogue.

18. The rule requires the movant to file not later than twenty-one days after "the date on which the moving party learns or with the exercise of reasonable diligence should have learned of the grounds upon which the motion is based." Utah R. Crim. P. 29(c)(1)(B)(iii); *see also* Utah R. Civ. P. 63(b)(2) (imposing the same timeliness requirement in civil actions). Optimally, the

(continued…)

the defendant timely moves to disqualify the judge, the motion is either granted or referred to a neutral judge to decide the issue. *See supra* ¶ 53 note 16. Thus, rule 29 is the mechanism by which defendants may invoke the relevant requirements of the Code of Judicial Conduct. And hence, when reviewing a case in which the defendant moved to disqualify the judge, appellate courts assume that the issue was resolved properly through the rule 29 process in the first instance. The defendant therefore bears the extra burden on appeal of showing not just an appearance of bias, but actual bias.

¶56   However, that process presumes that the judge disclosed the facts necessary to support the rule 29 motion in the first place or that the party learned those facts through some other means. The case at bar, though, involves an appearance of partiality that was raised for the first time on appeal because the judge did not disclose the facts giving rise to the challenge. Van Huizen therefore had no basis to invoke rule 29,[19] and the reasoning underlying the imposition of a burden of prejudice on appeal does not apply here.

¶57   The second difference between this case and those requiring a showing of prejudice is found in the judge's degree of involvement in the ultimate disposition of the case. In *State v. Alonzo*, the supreme court affirmed this court's reasoning that a judge's appearance of partiality was more likely to be harmless

_____

(…continued)
time would begin at the point of the judge's disclosure to the parties of any relevant relationship.

19. Van Huizen's averment that he was not aware of the relationship until well after the bindover is uncontradicted in the record before us, and no one has suggested that his lack of knowledge was the result of any failure to "exercise . . . reasonable diligence." *See* Utah R. Crim. P. 29(c)(1)(B)(iii).

because the "[d]efendants' guilt was determined by a jury and the judge's [biased] statements were . . . not made in the jury's presence." 973 P.2d 975, 979–80 (Utah 1998) (original ellipses, citation, and internal quotation marks omitted). Thus, both this court and the supreme court seemed to consider the jury to be an important intermediary in the decision making process which shields a criminal defendant from the possible effects of a judge's partiality. Utah is not alone in taking that position. *E.g.*, *Commonwealth v. Mercado*, 649 A.2d 946, 960 (Pa. Super. Ct. 1994) ("Moreover, when a defendant is tried by a jury, which exercised sole responsibility for evaluating the testimony and arriving at a verdict, the integrity of the fact-finding process is insulated from any predispositions held by the trial judge."). *But see Parenteau v. Jacobson*, 586 N.E.2d 15, 19 (Mass. App. Ct. 1992) (holding that "a courtroom has no place for a judge whose impartiality in a matter may be reasonably questioned, even if he is not the fact-finder").

¶58   In this case, Van Huizen never had the opportunity to invoke the procedural mechanism that the *Alonzo* court determined shifts the burden and requires the appellant "to show actual bias or abuse of discretion" to prevail on appeal. *Alonzo*, 973 P.2d at 979. Additionally, the Juvenile Judge acted alone in Van Huizen's bindover hearing, making both factual and legal determinations in arriving at a decision that is both fact sensitive and highly discretionary; there was no jury to insulate the bindover decision from the appearance of partiality. *See id.* at 979–80.

¶59   For these reasons, we conclude that this case is dissimilar to the *Alonzo* line of cases that require a prejudice showing. This case is similar, however, to *Regional Sales Agency, Inc. v. Reichert*, which did not impose a prejudice requirement. In this case, as in *Reichert*, the facts constituting the appearance of partiality were not disclosed by the judge below and there was no jury to insulate the process from the potential effects emanating from the appearance of partiality. 830 P.2d 252, 257–58 (Utah 1992).

Thus, we conclude that Van Huizen is entitled to relief without showing prejudice on the basis that the Juvenile Judge's marriage to the Chief Criminal Deputy created an appearance of partiality that went undisclosed and thus unaddressed below.

¶60   Other courts have reached a similar conclusion. For example, the New Hampshire Supreme Court "decline[d] to implement a harmless error test when evaluating violations of the code [of judicial ethics] by the members of the New Hampshire bench" because "it would be inconsistent with the goals of our code to require certain standards of behavior from the judiciary in the interest of avoiding the appearance of partiality, but then to allow a judge's ruling to stand when those standards have been violated." *Blaisdell v. City of Rochester*, 609 A.2d 388, 391 (N.H. 1992); *see also Scott v. United States*, 559 A.2d 745, 751 (D.C. 1989) (en banc) ("Furthermore, a defendant is not required to show prejudice from a violation of the standard set by [the code of conduct] as would affect the outcome of the trial in order to be entitled to the extraordinary writ of mandamus."); *State v. Smith*, 635 So. 2d 512, 514 (La. Ct. App. 1994) ("Although in the instant case there was no motion to recuse [the judge], we believe that the interests of justice and the avoidance of impropriety require a reversal of sentence and a remand for resentencing.").

¶61   And in *Velardo v. Ovitt*, the Vermont Supreme Court addressed circumstances similar to those here. 2007 VT 69, 933 A.2d 227. In *Velardo*, a party claimed that the trial judge should have recused due to an appearance of partiality that was not identified until after trial in a child custody dispute. *Id.* ¶ 1. After determining that the complicated circumstances created the appearance of partiality, the court turned to the question of remedy and determined that a split of authority exists on whether vacatur is warranted absent a showing of prejudice. *Id.* ¶¶ 12, 23–28. The court stated:

We reject the North Dakota Supreme Court's holding that orders of a judge who creates an appearance of impropriety cannot be set aside unless there is a showing of actual bias or prejudice. On this point, we agree with the New Hampshire Supreme Court that such a rule would be inconsistent with the goals of our code to require certain standards of behavior from the judiciary in the interest of avoiding the appearance of partiality, but then to allow a judge's ruling to stand when those standards have been violated. On the other hand, we believe that [the New Hampshire Supreme Court's] holding that a judge's failure to disqualify can never be harmless goes too far.

*Id.* ¶ 28 (citations and internal quotation marks omitted). The *Velardo* court therefore took a middle ground and imported a federal balancing test to determine on a case by case basis whether vacatur is a proper remedy. While we do not adopt the Vermont balancing test, that approach confirms and reinforces the analytical approach that we have identified in our own precedent.

¶62    For instance, as in our case, the *Velardo* court noted that the judge "had actual knowledge of the source of the conflict" and "an independent duty to disclose the relationship that created the conflict." *Id.* ¶ 29. The court also noted that the decision below was a "very difficult . . . case," *id.* ¶ 31 (internal quotation marks omitted), a factor similar to the situation here, where the Juvenile Judge's decision was apparently a close call— she found by the high standard of clear and convincing evidence that one of the two statutory factors favored Van Huizen's retention in juvenile court. Thus, we agree with the *Velardo* court that, because "the result was not easily reached," "[t]he appearance of influence, therefore, [was] significant." *See id.* Finally, the court pointed out that, "because we afford such wide

discretion to the family court, we cannot determine with any precision the influence of partiality, if any." *Id.* Without question, juvenile courts in Utah are similarly afforded "broad discretion regarding judgments, based on the juvenile court's specialized experience and training," *In re J.R.*, 2011 UT App 180, ¶ 2, 257 P.3d 1043 (per curiam), which serves to both obscure the effects of partiality and potentially amplify the consequences. For these reasons, the Vermont Supreme Court's analysis supports our own conclusion that a showing of prejudice or actual bias on appeal is not required in this case.

C.     Remedy

¶63    We conclude that Van Huizen is entitled to a new bindover hearing because the Juvenile Judge's spousal relationship with the Chief Criminal Deputy created an appearance of partiality in the original bindover proceeding. Because the Juvenile Judge did not disclose her relationship, Van Huizen did not have the opportunity to move for disqualification under Rule of Criminal Procedure 29, which allows a party to challenge the impartiality of a judge in a juvenile case. *See supra* ¶ 53 note 16. Thus, Van Huizen never invoked the procedural mechanism that in other cases has been a factor in requiring a showing of prejudice to succeed on a claim of appearance of judicial partiality on appeal. *See State v. Alonzo*, 973 P.2d 975, 979 (Utah 1998) (indicating that a failed attempt to disqualify a judge is a prerequisite for requiring a party "to show actual bias or abuse of discretion" on appeal). Further, the bindover decision here was solely within the realm of the Juvenile Judge's discretion, with no independent decision maker such as a jury to attenuate the potential effects of any partiality. *See id.* at 979–80 (indicating that a jury helps insulate a judge from the effects of an appearance of partiality).

¶64    We therefore conclude that Van Huizen is not required to show prejudice to prevail on appeal under these circumstances. In a situation like this, where the relevant information was

neither disclosed by the judge nor known to Van Huizen at the time of his bindover hearing, the appearance of partiality is enough to require a new hearing. *See Regional Sales Agency, Inc. v. Reichert*, 830 P.2d 252, 254, 257–58 (Utah 1992) (remanding for new proceedings without conducting a prejudice analysis in circumstances where the facts giving rise to an appearance of partiality were not previously known).

CONCLUSION

¶65 Based on the analysis set forth above, we vacate the juvenile court's bindover order and remand the issue for a new hearing before a different judge. If Van Huizen is bound over to district court, the results of his district court proceeding will remain undisturbed. If Van Huizen is not bound over, his convictions in the district court shall be vacated.

―――――