**2017 UT App 210**

## THE UTAH COURT OF APPEALS

STATE OF UTAH, IN THE INTEREST OF K.B., B.B., AND L.B.,
PERSONS UNDER EIGHTEEN YEARS OF AGE.

R.B.,
Appellant,
*v.*
STATE OF UTAH,
Appellee.

Opinion
No. 20160677-CA
Filed November 16, 2017

Fourth District Juvenile Court, Provo Department
The Honorable Brent H. Bartholomew
No. 1126443

Scott N. Weight, Attorney for Appellant

Sean D. Reyes, Carol L.C. Verdoia, and John M.
Peterson, Attorneys for Appellee

Martha Pierce, Guardian ad Litem

JUDGE KATE A. TOOMEY authored this Opinion, in which JUDGES
MICHELE M. CHRISTIANSEN and RYAN M. HARRIS concurred.

TOOMEY, Judge:

¶1    R.B. (Mother) appeals the juvenile court's award of
protective supervision of her three minor children[1] to Utah
Division of Child and Family Services (DCFS). Mother makes
three arguments on appeal: (1) there was insufficient evidence to

---

1. At the time this opinion issued K.B. was no longer a minor.
Our holdings as they relate to her are therefore moot.

support finding that her "apparent hate and disgust of [Father]" or her custodial interference caused the children to suffer emotional harm, (2) there was insufficient evidence to support finding that all three children were neglected, and (3) the juvenile court erred in substantiating DCFS's supported findings of non-severe physical abuse against K.B. We affirm in part, reverse in part, and remand for further proceedings consistent with this opinion.

## BACKGROUND

### *The Incident*

¶2    Early one Saturday morning, a neighbor contacted the police to report a "family argument" after hearing screaming and a bump on the wall.[2] In response to this report, an officer (Officer) and her partner went to Mother's residence. Upon their arrival, K.B., who was sixteen at the time, was the only person at home and answered the door. She "was extremely upset, red face[d]," and crying to "the point of hyperventilating." Officer noted the "left side of [K.B.'s] face was swollen and red, along with her eye" and her bottom lip was actively bleeding. K.B. informed Officer that Mother had slapped her mouth and pushed her by the neck against the refrigerator (K.B.'s incident) because "she hadn't mopped [the floor] as was expected." K.B. also admitted she slapped Mother and yelled at her "loud enough for the neighbors to hear." Officer determined there was enough evidence to arrest Mother for child abuse and released K.B. and her minor siblings, B.B. and L.B., to the custody of their father (Father).

---

2. On appeal from juvenile court proceedings, "we recite the facts in the light most favorable to the juvenile court's decision." *State v. Van Huizen*, 2017 UT App 30, n.2, 392 P.3d 933.

¶3    Following K.B.'s incident, DCFS filed a petition seeking an award of protective supervision[3] (the Petition) over the children with the juvenile court. The Petition revealed that DCFS had supported[4] findings against both Mother and Father of physical abuse of K.B.[5] As a result of K.B.'s physical abuse, the Petition alleged all of the minor children were abused or neglected.

### The Family

¶4    Father and Mother divorced in 2010 and have four children. Three of them, K.B., B.B., and L.B., were minors at the time DCFS filed the Petition, and another child, T.B., turned eighteen before the Petition was filed. At the time DCFS filed the Petition, the three youngest children resided with Mother, and T.B. with Father. Each parent had "joint custody of the children with a two week on/off [parent-time] schedule."

¶5    The relationship between Mother and Father had long been and continues to be strained. Shortly after the divorce,

---

3. "Protective supervision" is "a legal status created by court order following an adjudication on the ground of abuse, neglect, or dependency, whereby the minor is permitted to remain in the minor's home, and supervision and assistance to correct abuse, neglect, or dependency is provided." Utah Code Ann. § 78A-6-105(41) (LexisNexis Supp. 2017).

4. Utah Code section 62A-4a-101(41) (LexisNexis Supp. 2017) defines "supported" as "a finding by [DCFS] based on the evidence available at the completion of an investigation that there is a reasonable basis to conclude that abuse, neglect, or dependency occurred."

5. The supported findings against Father arose from a separate, earlier incident that is not the subject of this appeal.

Father committed criminal trespass at Mother's house. Mother later obtained a protective order prohibiting Father from communicating with her unless the communication was "in writing regarding the children." The protective order did not include the children.[6] Another basis for their strained relationship was Mother's discovery of sexually explicit "chat logs" between Father and a 17-year-old girl. These communications led Mother to believe Father had a "sexual affair" with the girl and that he was a "sexual predator." As a result, Mother was concerned that Father might sexually abuse the children during his parent-time. She reported her concerns to the police, but he was never charged with a crime.

¶6    Although Father had joint custody of the children and a parent-time order was in place, Mother often did not cooperate when Father arrived to pick up the children. Father reported many of these incidents to the police, and Mother was eventually charged with nine counts of custodial interference.[7] Mother offered several justifications for her interference. First, she challenged the charges by arguing that they did not amount to "custodial interference because the children didn't want to go" to Father's house. Second, Mother argued that she believed any interference was excused because of her concerns and reports that Father is a sexual predator and might abuse the children. Third, Father sometimes arrived very late for his mid-week parent-time and, by the time he arrived, Mother and the children were no longer waiting for him. Mother admitted that on one occasion she had threatened to withhold parent-time from

---

6. T.B. was still a minor at the time of the divorce.

7. The record shows that Father had one mid-week parent-time visit with the children, but the record does not contain additional detail regarding the dates and times of his parent-time.

Father if he did not pay his portion of the children's medical bills, but she did not follow through on that specific threat.

*The Trial*

¶7    T.B. and K.B. each testified at trial. The majority of the questioning of T.B. centered on Mother's treatment of K.B., and she was asked to describe their arguments. T.B. described them as "loud, angry, [and] mean." She also testified that the arguments sometimes turned physical and that Mother had hit K.B. in the face and shoulders and had pulled K.B.'s hair. When asked why she left to live with Father a few months before turning eighteen, T.B. testified it was because she did not feel safe, happy, or welcome in Mother's house. None of the attorneys asked T.B. to further elaborate on Mother's treatment of the children.

¶8    Mother testified to rebut, among other things, T.B.'s testimony about Mother's treatment of the children. Specifically, Mother attempted to show that T.B. chose to live with Father, not because she felt unsafe, but because of a disagreement between Mother and T.B. over T.B.'s choice of prom dress. According to Mother, T.B. agreed that she would wear the same prom dress she wore the year before, but the weekend before the prom, Father bought T.B. a new dress that Mother thought was inappropriate and immodest. Mother told T.B. she could either wear the dress from the year before or she would be grounded from going to the prom. T.B. did not attend the prom and, within a month, left Mother's house to live with Father. T.B. denied that being grounded from the prom was the reason she chose to live with Father. Instead, she said it was because of the way Mother treated her and her siblings.

¶9    K.B., on the other hand, testified that she felt safer at Mother's house and often chose not to go to Father's house. K.B. explained that when she and her siblings were at Father's house, B.B. and T.B. would "boss [her] around" and that "everything

about [Father] and his house and everyone there" caused her to "get so stressed" that she preferred not to visit with Father.

¶10    B.B. and L.B., who were ages fifteen and eight at the time of the trial, did not testify; the juvenile court heard about them through their grandfather's (Grandfather) testimony. On the day of K.B.'s incident, Grandfather took L.B. to a football game where B.B. was working at a concession stand. While they were at the game, Grandfather learned of K.B.'s incident. After halftime, Grandfather took L.B. and B.B. and left the game. Shortly after leaving, Grandfather received a phone call from Officer instructing him to bring L.B. and B.B. back to Mother's house so Father could take all of the children while Mother was in custody. When they returned, the police were still at the house and Mother had been removed from the house. B.B. and L.B. went inside to pack their clothes and, according to Grandfather, were "crying hysterically" when they left. Grandfather also said that L.B. feared that if he left with Father he would never see Mother again. Grandfather was not asked to elaborate on whether L.B. or B.B. explained their distress about leaving Mother's house to stay with Father.

¶11    At the end of the trial, the juvenile court found that Mother physically abused K.B.[8] The juvenile court also found that as a result of "Mother's apparent hate and disgust of Father" as well as her custodial interference "all of the children suffered significant emotional abuse." The juvenile court issued an order (the Order) that awarded DCFS "protective supervision over the minor children." Mother timely appeals.

---

8. We determined in a previous order that there was sufficient evidence to support finding that Mother physically abused K.B. when Mother slapped K.B. across the face.

ISSUES AND STANDARDS OF REVIEW

¶12    Mother contends there was insufficient evidence for the juvenile court to find that she either emotionally abused or physically neglected the children. When a challenge to the sufficiency of the evidence is raised, "we review the juvenile court's factual findings based upon the clearly erroneous standard." *In re S.O.*, 2005 UT App 393, ¶ 12, 122 P.3d 686 (per curiam) (citation and internal quotation marks omitted).

¶13    Mother also contends that the juvenile court erred in applying Utah Code section 78A-6-323 when it substantiated DCFS's supported findings of non-severe physical abuse against K.B. Whether the juvenile court had authority to substantiate findings made by DCFS regarding non-severe physical abuse "presents a question of statutory interpretation, which we review for correctness." *J.J.W. v. State*, 2001 UT App 271, ¶ 8, 33 P.3d 59.

ANALYSIS

I. Emotional Abuse

¶14    Mother contends that the Order "failed to detail sufficient facts to support its conclusion that the children had been emotionally abused." Because "the juvenile court is in a far better position to evaluate the evidence than an appellate court," *see In re L.P.*, 1999 UT App 157, ¶ 9, 981 P.2d 848, we will not reverse a juvenile court's order unless the "findings are so lacking in support as to be against the clear weight of the evidence," *see In re S.O.*, 2005 UT App 393, ¶ 12. The juvenile court found that "Mother's apparent hate and disgust of Father cause[d] emotional harm and damage to the children" and that "Mother's denial of [parent-time with Father] constitute[d] emotional abuse and neglect of [the] children." We agree with

Mother that these findings are against the clear weight of the evidence.[9]

¶15 Relevant to this case, under Utah Code section 78A-6-105, "abuse" includes the "nonaccidental harm of a child." *See* Utah Code Ann. § 78A-6-105(1)(a)(i)(A) (LexisNexis Supp. 2017). Thus, the State was required to show that as a result of the parent's actions the children suffered a "harm." Among other things, the definition of "harm" includes "emotional damage that results in a serious impairment in the child's growth, development, behavior, or psychological functioning." *Id.* § 78A-6-105(24)(b). Thus, for the juvenile court to find Mother emotionally abused the children, it must develop findings of fact sufficient to show that the children suffered "emotional damage" that amounted to a *"serious impairment"* to their "growth, development, behavior, or psychological functioning." *See id*. (emphasis added).

¶16 Mother argues that the State failed to provide evidence that would allow the juvenile court to conclude that her "apparent hate and disgust of Father constituted emotional abuse." We agree.

¶17 To support its finding that Mother's negative feelings toward Father caused the children to suffer emotional harm, the juvenile court stated that it would "elaborate on *one* piece of testimony that brought this fact into clear focus." (Emphasis added.) It then recounted the disagreement surrounding T.B.'s prom dress. The juvenile court found that, "[i]f the prom dress was inappropriate, Mother could have" exchanged the dress and

---

9. Mother also contends there was insufficient evidence to find that she withheld parent-time from Father. We will not address the merits of this issue because we are able to determine there was insufficient evidence to support a finding of emotional abuse, regardless of whether Mother unlawfully withheld parent-time.

let T.B. go to the prom. But because Mother would not exchange the dress Father purchased, the court found that, "[s]imply put, Mother did not want her daughter to go to the prom in the dress Father purchased."[10]

¶18   The juvenile court found that the disagreement over the prom dress provided the best example of Mother's hatred of Father and that, as a result of this hatred, all of the children were emotionally abused. Although we can find no Utah case law defining emotional abuse, we cannot accept the juvenile court's unsupported statement that one parent's hatred of the other by itself "constitutes emotional damage and harm to their children."[11] Two Utah court decisions help guide our analysis.

¶19   In *In re J.R.*, 2011 UT App 180, 257 P.3d 1043 (per curiam), a father challenged the juvenile court's finding of emotional abuse by arguing that "his conduct was reasonable discipline and therefore excepted under Utah law." *Id.* ¶¶ 1, 3 (citing Utah Code Ann. § 78A-6-105(1)(b)(i) (LexisNexis 2008)). During the proceedings, several witnesses testified, among other things, that the father called J.R., "her mother, and her sister vile names, accus[ed] J.R of sexual activity, and threaten[ed] J.R. with an

---

10. The juvenile court also stated that, instead of doing the "sensible act[]" of exchanging the dress, Mother grounded T.B. and "then sued [T.B.] for complaining about it" on social media. Mother sued T.B. for defamation but later voluntarily dismissed the complaint.

11. From the few facts presented in this case that Mother and Father do not get along, we cannot conclude that the State provided sufficient evidence to support a finding that the children at issue suffered a more "serious impairment" than most children of divorced parents, particularly in a high-conflict divorce situation. *See* Utah Code Ann. § 78A-6-105(24)(b) (LexisNexis Supp. 2017).

examination to prove or disprove her virginity." *Id.* ¶ 5. There was also evidence to support that "the continual degrading accusations and name calling resulted in emotional damage to J.R. over the course of time to the point that J.R. had begun to harm herself." *Id.* We determined this set of facts provided an example of emotional abuse because of the direct impact it had on J.R., as evidenced through her self-harming behavior. *See* Utah Code Ann. § 78A-6-105(24)(b). Accordingly, we affirmed "the juvenile court's determination that J.R. was emotionally abused by Father." *In re J.R.*, 2011 UT App 180, ¶ 6.

¶20    Unlike *In re J.R.*, neither the Order nor the record provides any supporting evidence that Mother engaged in conduct that had a direct impact on the "growth, development, behavior, or psychological functioning of the minor children." *See* Utah Code Ann. § 78A-6-105(24)(b). Instead, the unsupported conclusions of the juvenile court in this case align more closely with the unsupported findings of physical harm in another case, *In re K.T.*, 2017 UT 44.

¶21    In *In re K.T.*, our supreme court reviewed a juvenile court order that found that the parents physically abused their children by spanking them with a belt. *Id.* ¶¶ 1, 4. The juvenile court found that the father "spanked the children with a belt historically," *id.* ¶ 1, and that the mother used a "black belt with rhinestones," *id.* ¶ 17. The juvenile court concluded that "[h]itting a child with a belt or strap or another object is abuse" and that it could not "envision a scenario where striking or hitting a child, of any age, would be appropriate or reasonable discipline." *Id.* ¶ 5. The parents appealed, arguing "that the juvenile court erred when it concluded that spanking a child with a belt, *without any additional proof of harm*, constitutes abuse within the meaning of Utah law." *Id.* ¶ 7 (emphasis added). Our supreme court determined that the State "failed to introduce evidence that the parental discipline had harmed the children and left the court to speculate . . . that the children had been harmed." *Id.* ¶ 10. And although the court "might speculate that

[the mother] was doing more than spanking her children with the belt lightly so that it did not cause physical or emotional injury within the meaning of the statute," there was no evidence to support that conclusion "with the level of certainty needed to meet the clear and convincing evidentiary standard." *Id.* ¶ 15. Therefore, our supreme court reversed the juvenile court's finding of abuse because the "juvenile court made no findings that inform[ed the court] whether the children experienced any 'physical, emotional, or developmental injury or damage.'" *Id.* ¶¶ 17–18 (citing Utah Code § 78A-6-105(19) (2008)).

¶22 Although *In re K.T.* does not address emotional abuse, it is instructive to our analysis. As in *In re K.T.*, no proof of harm was presented to the juvenile court to support its finding that the children suffered emotional damage as a result of "Mother's apparent hate and disgust of Father." To the contrary, K.B. commented that she preferred living with Mother because she gets "so stressed" when she is at Father's house and is bossed around by her siblings there, which is not the case at Mother's house. Our review of the record shows B.B. and L.B. made no statements to the police officers who interviewed them that relate to their emotional well-being or their relationship with Mother. And neither B.B. nor L.B. testified at the trial. Thus, there was no evidence before the juvenile court to support the conclusion that Mother emotionally abused the children to the "level of certainty needed to meet the clear and convincing evidentiary standard." *Id.* ¶ 15.

¶23 Because the disagreement regarding T.B.'s prom dress is the only supporting fact for the juvenile court's finding that Mother "constantly and consistently" put the children in the middle of her arguments with Father, and because T.B. is not one of the minor children at issue in this case, we conclude this disagreement alone was insufficient to support the juvenile court's finding that Mother emotionally abused all the minor children. And one instance, alone, of Mother putting a child in the middle of an argument she had with Father could not be

considered "constant" or "consistent," as both terms imply a pattern of behavior. *See Constant*, Webster's Third New International Dictionary (1968) ("[M]arked by continual recurring or regular occurrence."); *see also Consistent*, Webster's Third New International Dictionary (1968) ("[M]arked by unchanging position."). Absent additional facts relating to the harm inflicted on the children, we agree with Mother that there was insufficient evidence to support the statement that "Mother's apparent hate and disgust of Father cause[d] emotional harm and damage to the children."

¶24   For similar reasons, we also cannot accept the unsupported statement that denial of parent-time constitutes emotional abuse. Mother has been charged with custodial interference, but those charges had not been adjudicated at the time of this trial. Even assuming Mother committed custodial interference and that her actions do not fall within any of the statutory defenses to those charges, *see* Utah Code Ann. § 76-5-305 (LexisNexis 2012), the juvenile court's finding that Mother's custodial interference caused the children to suffer emotional harm is not supported.

¶25   Not every instance of custodial interference will cause a child to suffer "emotional damage that results in serious impairment of the child's growth, development, behavior, or psychological function." *See* Utah Code Ann. § 78A-6-105(24)(b) (LexisNexis Supp. 2017). For a juvenile court to conclude that custodial interference constitutes emotional abuse there must be specific evidence to support such a conclusion. There was no such evidence here. No witness testified that the children were suffering, let alone suffering "serious impairment" as a result of custodial interference.

¶26   The best evidence to support finding that B.B. and L.B., but not K.B., may have suffered emotional damage was through Grandfather's testimony. First, Grandfather was concerned that Father would not return the children to Mother following her

release from custody as a result of K.B.'s incident. He based this concern on T.B. remaining with Father, even though the parents shared joint custody. But T.B. testified that she chose to live with Father and that Father had not prevented her from returning to Mother's house. And the juvenile court stated in its findings of fact that T.B. was a credible witness because she was honest and direct, and her testimony was unwavering.

¶27 Second, Grandfather stated that, while the children were packing their belongings to stay with Father until Mother's release, L.B., who was eight at the time, expressed his fear that if he went to stay with Father he would never see Mother again. The Guardian ad Litem argued on appeal that because of Grandfather's statement, the juvenile court could reasonably infer that Mother was responsible for feeding her family with misinformation that T.B. was, essentially, "kidnapped" by Father. The Guardian ad Litem also argued that this supported finding that Mother was responsible for "the ongoing drama, and the resulting emotional trauma causing the [c]hildren to be fearful and to cry hysterically." While Grandfather's testimony does reflect that B.B. and L.B. cried "hysterically" when they left Mother's house to stay with Father, the juvenile court could only speculate about the reason for this behavior because no one asked B.B. or L.B. what had upset them. *See In re K.T.*, 2017 UT 44, ¶ 15 (explaining that although the juvenile court may speculate that the actions of a parent rise to the level of abuse, there must be sufficient facts to support that the child suffered a harm "to meet [the] clear and convincing evidentiary standard"). Indeed, the presence of the police officers and Mother's arrest may have been factors in their distress and L.B. may well have thought that Mother was going to jail for a long time. And many families in high-conflict divorce situations experience stress during custodial exchanges. The evidence presented here was insufficient to support a conclusion that the minor children in this case suffered any "serious impairment" in their "functioning" as a result of the custodial issues experienced.

¶28     After considering these facts in the light most favorable to the juvenile court's decision, we agree with Mother that there was insufficient evidence to support finding that her denial of parent-time with Father, and her "apparent hate and disgust of Father," resulted in emotional damage that caused "a serious impairment in the [children's] growth, development, behavior, or psychological functioning." *See* Utah Code Ann. § 78A-6-105(24)(b).

## II. Neglect

¶29     Mother contends there was insufficient evidence to find that she neglected the children. Specifically, Mother argues, "It is circular reasoning to argue that because K.B. was abused, B.B. and L.B. are neglected, and therefore K.B. must be neglected because B.B. and L.B. are neglected." We agree with Mother that this reasoning relied on by the court is unpersuasive with respect to K.B.'s neglect. We have already concluded, in a separate order, that K.B. was abused. *Supra* note 8. Under the statutory definition of "neglect," it follows that B.B. and L.B. must be considered "neglected," because they live in the same household as K.B. However, we agree with Mother that, although K.B. is "abused," she is not "neglected" as that term is defined by statute.

¶30     Neglect is defined by statute as, among other things, "action or inaction causing . . . a child to be at risk of being neglected or abused because another child in the same home is neglected or abused." Utah Code Ann. § 78A-6-105(35)(a)(iv) (LexisNexis Supp. 2017). Thus, if one child is adjudicated to have been abused, the other children in the same household can be found to be "at risk of being neglected or abused" simply because they reside in the same household as the abused child. *See id.*; *see also In re A.C.*, 2014 UT App 157, ¶ 5, 330 P.3d 725 (per curiam) (explaining that A.C. was "at risk of being neglected because at least four of her siblings had been the subject of child welfare proceedings that culminated in Mother's relinquishment

of parental rights" (citing Utah Code Ann. § 78A-6-105(27)(a)(iv) (LexisNexis 2012))).

¶31 We have already determined, in a previous order, that there was sufficient evidence to support the juvenile court's finding that Mother physically abused K.B. when Mother slapped K.B. across the face. It necessarily follows from the statute that B.B. and L.B. are thus "at risk of being neglected or abused" simply by virtue of residing with K.B. *See* Utah Code Ann. § 78A-6-105(35)(a)(iv).

¶32 But we are not convinced that, at the time K.B. was a minor, the juvenile court could have concluded that K.B. was neglected by virtue of residing in the same household as B.B. and L.B., who were neglected by virtue of having resided with K.B. This reasoning is not logically consistent with the distinct statuses of "abuse" and "neglect" within the Utah Code.[12] *See id.* § 78A-6-105(1)(a) (defining abuse); *see also id.* § 78A-6-105(35)(a) (defining neglect). If we were to follow this reasoning it would necessarily result in this court holding that any time a child is abused that child is neglected if that child has siblings. Under this logic, if an only-child were abused, that child could not be determined to be neglected on the basis of that abuse, because that child does not live with other children who are at risk of neglect or abuse by virtue of living with the abused child. On the other hand, if an abused child resided with siblings, then the abused child would automatically be neglected. Thus, an only-child would have fewer protections than a child with siblings. This would also strip away the meaning of neglect and essentially combine the two distinct statuses of "abused" and "neglected."

---

12. Although our holdings are moot as to K.B., we address whether K.B. could have been adjudicated as neglected at the time she was a minor to clarify the distinction between neglect and abuse under the Utah Code.

¶33 We therefore conclude there was sufficient evidence to support a finding of neglect of B.B. and L.B., by virtue of Utah Code section 78A-6-105(35)(a) and the juvenile court's already-affirmed finding that K.B. was abused. We affirm the juvenile court's order in that respect, but reverse the juvenile court's order finding K.B. neglected, as her status does not fall within the meaning of neglect.

### III. Substantiating Findings of Non-Severe Physical Abuse

¶34 Mother also contends that the juvenile court "erred in applying Utah Code [section] 78A-6-323 by substantiating previous agency supported findings of *non-severe* physical abuse against K.B. by Mother in an adjudication on a petition also based on *non-severe* physical abuse." (Emphases added.) Mother argues that section 78A-6-323 does "not permit the juvenile court to substantiate supported findings [here] as neither the allegation being adjudicated nor the previous supported findings involved a '*severe* type of abuse or neglect' under Utah Code [section] 62A-4a-1002." (Emphasis added) (citing Utah Code Ann. § 62A-4a-1002 (LexisNexis 2011)). Both the State and the Guardian ad Litem have conceded that the "plain language" of section 78A-6-323 does not "grant[] the juvenile court authority to 'substantiate' a DCFS supported finding where there is no allegation of severe abuse or neglect." Therefore, on remand, the juvenile court shall weigh only the evidence presented during the proceedings and cannot substantiate DCFS findings of non-severe abuse or neglect in determining whether to grant the Petition and award DCFS with "protective supervision over the minor children."

### CONCLUSION

¶35 We conclude there was insufficient evidence for the juvenile court to find that Mother caused the children to suffer emotional damage that resulted in a "serious impairment in the

[children's] growth, development, behavior, or psychological functioning." *See* Utah Code Ann. § 78A-6-105(24)(b) (LexisNexis Supp. 2017). We further conclude there was sufficient evidence to support the finding that B.B. and L.B. were neglected as a result of Mother physically abusing K.B., but that there is insufficient evidence to conclude that K.B. was neglected. We remand to the juvenile court to determine whether DCFS should be awarded protective supervision. On remand, consistent with this opinion, the juvenile court cannot substantiate DCFS findings of non-severe abuse or neglect in determining whether to grant the Petition.

———————